# In the United States Court of Federal Claims

## FOR PUBLICATION

Nos. 21-1373C, 21-1456C, 21-1472C
(Filed: August 5, 2022)

|  |  |  |
|---|---|---|
| **SERVANT HEALTH, LLC**, | ) | |
| *Plaintiff,* | ) | |
| and | ) | |
| **NOBLE ATTORNEY, LLC**, | ) | Breach of Supply Contract: |
| *Consolidated Plaintiff,* | ) | Termination for Default; Excusable Delay; |
| and | ) | Product Substitution; |
| **TRANSCENDENCE, INC.**, | ) | Implied Duty of Good Faith & Fair Dealing |
| *Consolidated Plaintiff,* | ) | |
| v. | ) | |
| **UNITED STATES,** | ) | |
| *Defendant.* | ) | |

*Eric S. Montalvo*, Federal Practice Group, Washington, DC, for plaintiffs.  With him on the briefs was *Carol A. Thompson,* Federal Practice Group, Washington, DC.

*Alison S. Vicks*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant.  With her on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, Commercial Litigation Branch, U.S. Department of Justice, Washington, DC.  *Tracy Downing*, U.S. Department of Veterans Affairs, District Contract Law National Practice Group, *Of Counsel*.

**OPINION AND ORDER**

***BONILLA, Judge.***

These three consolidated breach-of-contract cases arise from two solicitations for personal protective equipment (PPE)—nitrile examination gloves—issued by the United States Department of Veterans Affairs (VA or ageny) in early 2021 amid the global COVID-19 pandemic.[1]  With emerging variants and elevated hospitalizations, the solicitations at issue sought on-hand PPE supply to facilitate prompt delivery to VA healthcare personnel across the United States.

Plaintiffs Servant Health, LLC (Servant), Noble Attorney, LLC (Noble), and Transcendence, Inc. (Transcendence) were awarded supply contracts to deliver nitrile examination gloves of specified quantities from their proposed sources within a strict 45-day deadline or risk termination for default.  When plaintiffs failed to deliver conforming PPE by the contract deadline, the VA terminated the contracts for default.  Plaintiffs filed this action challenging their respective terminations for default, seeking to convert them into terminations for convenience and recover consequent monetary damages.  Pending before the Court are the parties' cross-motions for summary judgment.  For the reasons stated below, defendant's motion for summary judgment is GRANTED and plaintiffs' cross-motion for summary judgment is DENIED.

**BACKGROUND**

**I.     VA Solicitations**

In late 2020, "[b]ecause of increased demand caused by COVID 19 [sic] and a national shortage in the inventory and supply of nitrile examination gloves, the [VA] determined it would implement a plan to maintain a 180-day stock of nitrile examination gloves to ensure the availability of gloves for the Agency's healthcare providers." ECF 37-1 at 3.  To cover the agency's 1,244 healthcare facilities located throughout the United States, the VA determined that "hundreds of millions of nitrile examination gloves [were] required."  *Id.*

Between October 2020 and February 2021, the VA issued three solicitations for nitrile examination gloves.  *See generally id.* at 3–6.  "In order to ensure that the gloves would be provided quickly by the distributors, the solicitations . . . requested that the gloves be on-hand (or already in existence) so that delivery could be accomplished within 30-45 calendar days of contract award."  *Id.* at 3.  After reviewing the quotes received, between December 2020 and June 2021, the VA

---

[1] A fourth related case, *Am. Med. Equip., Inc. v. United States*, No. 21-1553C (Fed. Cl.), was recently decided by this Court.  *See* __ Fed. Cl. __, 2022 WL 2353084 (Fed. Cl. June 30, 2022).

awarded fifteen (15) contracts for the procurement of nitrile examination gloves, requiring quantities ranging from 2.5 million to 50 million. *Id.* at 3–6. The VA purposely awarded multiple contracts for smaller quantities of "on-hand" PPE to ensure delivery would be accomplished within 30 to 45 calendar days of contract award. *Id.* at 3, 6.

Relevant to this case, the VA issued Solicitation Nos. 36C24921Q0088 and 36C24921Q0115 on January 6 and February 9, 2021, respectively, for on-hand nitrile examination gloves to be delivered within 45 days of contract award. *Id.* at 4–5; *id.* at 51–117, 343–403 (including clarifying amendment). Transcendence received its contract award under the first solicitation, while Noble and Servant received theirs under the second. *Id.* at 265–88 (Transcendence contract); ECF 49-1 at 3–26 (Servant contract); ECF 37-3 at 171–94 (Noble contract). The two solicitations are substantively identical. *See generally* ECF 37-1 at 51–117, 343–403.

Under "Schedule of Supplies/Services," the first page of each solicitation states: "Delivery shall be 45 calendar days or sooner, after receipt of order." *Id.* at 53, 345. The solicitations' Statement of Work (Section B.2) stressed to potential bidders that the supply contract was intended for on-hand gloves and subject to a non-negotiable delivery schedule:

> This is *not a request for manufacturing but a request for quantity on hand to be delivered within 45 calendar days from order.*
>
> . . .
>
> Contracts that are awarded based on submitted quotes will have *45 calendar days* from receipt of order (award date) to deliver the awarded quantities, *or the contract will be terminated for cause* and negative performance will be reflected within the Contractor Performance Assessment Reporting System (CPARS) and the Federal Awardee Performance and Integrity Information System (FAPIIS).

*Id.* at 56, 348 (emphases added); *see also id.* at 112, 332 (Question No. 14 of PPE Source Questionnaire: "Quantity on hand (in-stock and available for immediate delivery)"). The firm 45-day deadline is restated throughout the solicitations. Under "Delivery Schedule" (Section B.4), for example, the solicitations state PPE must be delivered "45 calendar days after receipt of order" and further specify the delivery locations and instructions. *Id.* at 59, 351 (instructing potential awardees to make appointments with the designated warehouse ahead of delivery). Indeed, the solicitations list the 45-day deadline as an eligibility requirement for contract award, requiring offerors to submit a proposed delivery schedule not to exceed that timeframe. *See id.* at 83, 90, 376, 383.

To ensure the PPE was supplied through authorized distribution channels, the solicitations' Statement of Work required verifying documentation. *Id.* at 56, 348. If the offeror was not an original equipment manufacturer (OEM), the offeror was to submit "an Authorized Distributor Letter from the OEM . . . authorizing the [offeror] as a distributor for the proposed product(s)," and further required that the offeror maintain "its authorized distributor status . . . throughout the life of this agreement." *Id.* ("The letter must either state specific product(s) proposed or that the quoter is an authorized distributor for all the manufacturer's products. This letter must be on the manufacturer's letterhead and contain the signature of an authorized official for the manufacturer.")

For quality assurance, and to facilitate the technical evaluation of the proposed PPE, the solicitations set forth a chart of nine Mandatory Technical Requirements (MTRs) and required evidence demonstrating that each proposed product met the MTRs. *Id.* at 56–57, 348–49. Following the MTR chart, the solicitations stated:

> Evidence is required to be provided with the submitted quote to support the item(s) being quoted meet or exceed the mandatory technical requirements. This evidence is to include OEM product specifications, OEM product literature to include clear and readable pictures of the product and packaging with supporting [United States Food and Drug Administration (FDA)] 510K certification letter, ASTM [International], AMMI NIOSH certifications, test reports to support certifications, etc. . . . <u>Failure to provide this evidence as separate electronic files will render the quote submitted as technically unacceptable and not eligible for award.</u>

*Id.* at 349 (emphasis in original); *accord id.* at 57.

Section C.1 of the solicitations, titled "Contract Clauses . . . Contract Terms and Conditions—Commercial Items," incorporates pertinent provisions of the Federal Acquisition Regulation (FAR) governing commercial item acquisition. *Id.* at 60–76, 352–69. Relevant here, and as incorporated in the solicitations, FAR 52.212-4(f) provides:

> *Excusable delays.* The Contractor shall be liable for default unless nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence such as, acts of God or the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, unusually severe weather, and delays of common carriers. The Contractor shall notify the Contracting Officer in writing as soon as it is reasonably possible after the commencement of any

4

excusable delay, setting forth the full particulars in connection
therewith, shall remedy such occurrence with all reasonable dispatch,
and shall promptly give written notice to the Contracting Officer of the
cessation of such occurrence.

*Id.* at 60, 352 (italics in original).  FAR 52.212-4(m), also incorporated in the
solicitations, states:

> *Termination for cause.*  The Government may terminate this contract,
> or any part hereof, for cause in the event of any default by the
> Contractor, or if the Contractor fails to comply with any contract terms
> and conditions, or fails to provide the Government, upon request,
> with adequate assurances of future performance.  In the event of
> termination for cause, the Government shall not be liable to the
> Contractor for any amount for supplies or services not accepted,
> and the Contractor shall be liable to the Government for any and
> all rights and remedies provided by law.  If it is determined that
> the Government improperly terminated this contract for default,
> such termination shall be deemed a termination for convenience.

*Id.* at 64, 356 (italics in original).

Reiterating the requirements for evidence showing the offeror's authorized
distributor status, Section C.4 of the solicitations incorporates provisions of the
VA Acquisition Regulation (VAAR) prohibiting gray market and counterfeit items
and requiring documentation from the OEM showing the offeror to be an OEM or
otherwise authorized to distribute its proposed products.  *Id.* at 68, 360 ("No gray
market items shall be provided. Gray market items are OEM goods intentionally or
unintentionally sold outside an authorized sales territory or sold by non-authorized
dealers . . . . No counterfeit supplies or equipment/parts shall be provided.
Counterfeit items include unlawful or unauthorized reproductions, substitutions,
or alterations . . .").

Section E.2, titled "Instructions to Offerors-Commercial Items," reiterates the
evidence and delivery schedule requirements.  *See id.* at 82–83, 375–76.  Offerors
were to provide, inter alia: (1) evidence "to support the item(s) being quoted meet
or exceed the [MTRs,]" such as "product specifications & literature, and testing &
certifications"; (2) completed PPE Source Questionnaire for the proposed products,
summarizing offeror and product information, such as product testing, authorized
distribution, and shipping logistics; (3) "clear and readable photos of the nitrile
gloves boxes being proposed along with photos of the glove itself"; and (4) if the
offeror is not an OEM, a valid Authorized Distribution Letter from the OEM.  *Id.*
at 82–83, 109, 111–12, 331–32, 375–76.  The solicitations unequivocally advised

offerors that failure to provide these documents would render the quote ineligible for contract award. *See id.*

Under Section E.9, titled "Evaluation—Commercial Items," the solicitations note that the government "intends to award one or more firm fixed price contracts." *Id.* at 90, 382. This section lists three factors the VA would use in evaluating offers: technical capability, delivery schedule, and price. *Id.* at 90, 383. For technical capability, the solicitations explain that the VA evaluation team will review the documentation submitted for the proposed PPE product, including the required evidence outlined in the preceding paragraph. *Id.* Again stressing the firm 45-day delivery deadline, the solicitations state: "To be eligible for award, Offerors must be able to deliver within 45 calendar days from the award date." *Id.* at 90, 383.

As detailed below, each plaintiff submitted a quote and the required documentation for their proposed PPE products, assuring delivery within 45 days. After reviewing their quotes and supporting documentation, the VA awarded purchase orders to each plaintiff based on their proposed products and quoted prices. ECF 37-4 at 51–53 (Worsham Decl. at ¶¶ 4–5, 9–10, 15–16) (explaining review of plaintiffs' submitted documentation and awards based thereon).

## II.    Transcendence: Pre-Award Events, Performance, and Termination

### A. *Transcendence's Quote and Pre-Award Communications*

In response to Solicitation No. 36C24921Q0088 dated January 6, 2021, Transcendence submitted a quote to supply 50 million Medivico nitrile examination gloves for $6.925 million. *See, e.g.*, ECF 37-1 at 127, 159, 171; *see generally id.* at 118–221. The product documentation accompanying Transcendence's quote indicated the proposed gloves were manufactured by Chinese OEM Dong Tai City Huayi Gloves Co. Ltd. (Dong Tai), distributed through Medivico Healthcare Solutions (Medivico),[2] and resold by Transcendence. ECF 37-1 at 141–48 (government evaluation of FDA 510(K)[3] submitted by OEM Dong Tai); ECF 37-1 at

---

[2] Several Medivico-related entity names appear in Transcendence's submission. Transcendence's quotation sheet lists the OEM name as "Medivico Health Solutions" (ECF 37-1 at 119), but the company website lists the company as "Medivico Healthcare Solutions," and the distribution letter Transcendence submitted lists "Medivico Medical Supplies" (*id.* at 150). Rather than an OEM, as Transcendence represented, Medivico claims to be "a healthcare supply company" that distributes medical products "sourced from several countries worldwide." *See* https://www.medivico.com/about-us (last visited Aug. 4, 2022). Put simply, Medivico is a distributor as opposed to an OEM.

[3] According to the FDA's website: "A 510(k) is a premarket submission made to [the] FDA to demonstrate that the device to be marketed is as safe and effective, that is, substantially equivalent, to a legally marketed device . . . ." *See* https://www.fda.gov/medical-devices/premarket-submissions-selecting-and-preparing-correct-submission/premarket-notification-510k (last visited Aug. 4, 2022).

149 (ISO 9001 certification[4] issued to Dong Tai); ECF 37-1 at 150 (an "Authorized Distribution Letter" issued by Medivico stating Transcendence is their "exclusive reseller" to U.S. federal agencies).[5]

In response to the PPE Source Questionnaire, Transcendence indicated the proposed products were already produced and located in China and that "3 Million boxes of gloves" were "on hand (in-stock and available for immediate delivery")." *Id.* at 121. As for the proposed delivery schedule, the quote stated "Transcendence will deliver the requested gloves to all locations within 45 days per [VA] requirements," providing a chart illustrating its delivery timeline. *Id.* at 158; *see also id.* at 159, 172.

On January 20, 2021, VA Contracting Officer Charles W. Worsham notified Transcendence that its quote was under review and passed the technical evaluation. *Id.* at 228. Before issuing an award, the Contracting Officer asked Transcendence to confirm its original quote and verify delivery capability within 45 days, inviting Transcendence to, if necessary, revise its quote to reflect the amount Transcendence could deliver within 45 days:

> Please verify no change to your original glove type, quantity by size, price per glove and delivery within 45 calendar days from Award. . . . I cannot express how important it is to verify you can deliver[] within **45 calendar days from Award**. If this is a factor then please revise the offer to indicate what can be received at shipping location below within 45 calendar days.

---

[4] Established in 1987 by the International Organization for Standardization (ISO), and inclusive of the manufacturing standards of more than 160 countries:

> ISO 9001 is defined as the international standard that specifies requirements for a quality management system (QMS). Organizations use the standard to demonstrate the ability to consistently provide products and services that meet customer and regulatory requirements. It is the most popular standard in the ISO 9000 series and the only standard in the series to which organizations can certify.

*See* https://asq.org/quality-resources/iso-9001 (last visited July 24, 2022).

[5] Although the solicitation requires an authorized distribution letter "from the OEM" confirming the offeror as a distributor for the proposed PPE, as detailed in *supra* note 3, Transcendence submitted an "authorized distribution letter" from distributor Medivico rather than OEM Dong Tai. *Compare* ECF 37-1 at 56 (requiring "an Authorized Distributor Letter from the OEM . . . [which] shall include for each product(s) proposed authorizing the quoter as a distributor for the proposed product(s).") *with id.* at 150 (letter titled "Authorized Distributor Letter" issued by Medivico submitted by Transcendence with the company's quote).

*Id.* (emphasis in original).  The email correspondence also confirmed delivery location and reiterated that Transcendence was to make appointments with the designated distribution warehouse "ahead of delivery."  *Id.* at 228–29.

The next day, Transcendence confirmed no change to its offer and reassured delivery within 45 days, stating:

> Transcendence verifies that there are no changes to its offered Nitrile Glove by Medivico. We confirm that the glove type, quantity by size, price per glove, and delivery scheduled within 45 days is offered as stated in in [sic] our original quote dated 1/12/2021. . . . We also acknowledge and concur with the delivery instructions within B2 Statement of [W]ork with no changes.

*Id.* at 227–28.

### B. Transcendence's Contract Award

On January 22, 2021, consistent with Transcendence's quote and pre-award assurances, the VA issued Purchase Order No. 36C24921P0242 to Transcendence for the delivery of 50 million Medivico nitrile examination gloves at a contract price of $6.925 million.  *Id.* at 239, 245 (listing manufacture part number (MPN), stock number, and pricing included in Transcendence's quote).  Transcendence executed the contract the same day.  *Id.* at 232, 263.

The executed PPE supply contract awarded to Transcendence incorporates the same Statement of Work, Delivery Schedule, and FAR provisions included in the January 6, 2021 solicitation and Transcendence's January 12, 2021 quote; the contract is similarly consistent with the pre-award communications between the Contracting Officer and Transcendence.  *Compare id.* at 265–88 (contract award) *with id.* at 51–117 (solicitation) *and id.* at 118-221 (Transcendence's quote).  Above Transcendence's signature on the first page of the contract, the "Schedule of Supplies/Services" section states:

> This is an acquisition for surge supply of Nitrile Gloves for hospital staff in response to the increased usage caused by COVID-19.
> The contractor agrees to deliver the amount of supplies ordered in 45 calendar days from the execution of this contract.
>
> The No Later Than Delivery Date for entirety of order is 03/08/2021.

*Id.* at 265.  The contract's Statement of Work restates the on-hand requirement and firm 45-day deadline:

> This is not a request for manufacturing but a request for quantity on hand to be delivered within 45 calendar days from order.
>
> . . .
>
> Contracts that are awarded based on submitted quotes will have 45 calendar days from receipt of order (award date) to deliver the awarded quantities, or the contract will be terminated for cause and negative performance will be reflected within the [CPARS] and the [FAPIIS].

*Id.* at 268.  Under "Delivery Requirements," the contract repeats that delivery is due "45 calendar days after receipt of order" to the designated Defense Logistics Agency (DLA) distribution warehouse.  *Id.* at 269–70 (restating instructions requiring coordination with the warehouse ahead of delivery).  *Id.* at 270.

### C.  *Transcendence's Performance*

On February 2, 2021, eleven days into contract performance, the Contracting Officer reached out to Transcendence for an update and expected delivery date.  *Id.* at 290–91.  Six days later, Transcendence responded "[e]verything is moving forward as planned," and the company was "still working with the manufacturer to get a dedicated delivery after the Chinese New Year is over [on] February 12, 2021." *Id.* at 290.  After receiving no update by Friday, February 19, 2021, the Contracting Officer sent another request for an update.  *Id.* at 289.  Without identifying an expected shipment or delivery date, Transcendence reported it was "working with our manufacturer partners and are finalizing a program to make sure your products will be delivered in the fastest time possible."  *Id.*  Transcendence then promised to "provide a comprehensive shipping program and provide expected shipment dates" early in the week of February 22, 2021.  *Id.*

The record does not reflect any updates from Transcendence during the week of February 22, 2021.  On March 1, 2021, a week before the March 8, 2021 delivery deadline, the Contracting Officer contacted Transcendence again.  *Id.* at 292.  On March 4, 2021—four days before the delivery deadline—Transcendence informed the Contracting Officer it would not deliver the contracted PPE, explaining: "Medivico has informed us that they will not be able to deliver the required gloves on schedule due to unforeseen circumstances."  *Id.* at 293–94.  Transcendence then offered to deliver (by an unspecified date) a claimed "enhanced brand" (i.e., Kimberly-Clark KC500) "at no additional cost to the [VA]" distributed by "ATX Capital Management, LLC and their supply chain partners."  *Id.* at 294–95, 315.  Transcendence's email also attached documentation regarding the newly-offered product and a letter dated March 2, 2021, from ATX Capital Management, which represented itself as "either the Manufacturer, Authorized

Distributor, Authorized Sub Distributor or Title Holder" for the PPE products listed in its letter. *Id.* at 297–314, 315.

After explaining to Transcendence that "substitutions are not permitted," the Contracting Officer nevertheless expressed potential willingness to extend the delivery deadline for the PPE specified in the contract. *Id.* at 317. In an effort "to sa[l]vage the award, if possible," the Contracting Officer inquired:

> What is the timeline of receiving the awarded brand of gloves? We are possibly willing to grant a short extension to the delivery date as long as long as [sic] you can provide a guarantee letter from your supplier regarding the proposed new delivery date as well as consideration for the extension in the form of additional gloves at no additional cost to the government.

*Id.* The following day, in an email dated March 5, 2021, Transcendence notified the Contracting Officer that Medivico was "unable to fulfill their obligation to us due to the current state of the PPE market." *Id.* at 318. Transcendence then proposed yet another product (i.e., Synguard) from another distributor (i.e., PharmacyGo Medical Supplies) to be delivered between April 23 and May 6, 2021, thereby extending the contract performance period from 45 days to 104 days. *See id.* at 318–19, 322. For the newly proposed product, Transcendence did not include any supporting product literature, claiming instead that the proposed PPE had been previously approved and purchased by the VA. *See id.* at 318. Transcendence also attached an undated letter and an "Authorization Certificate" dated March 5, 2021, from PharmacyGo Medical Supplies representing that the distributor was partnering with Transcendence to fulfill the VA contract for 50 million nitrile examination gloves. *Id.* at 321–22. In requesting the nearly two-month contract extension (i.e., March 8 to May 6, 2021), Transcendence stated it would charge the "same price" as contracted, offering no discount or additional PPE. *Id.* at 318.

On March 8, 2021, the Contracting Officer rejected Transcendence's new proposal, explaining:

> . . . putting aside the main issue (glove substitution), this is definitely not acceptable. You are requesting 52 additional days (total 97 days) for delivery which the extension alone is more than the period of performance of the solicitation/award. Additionally, zero consideration was offered to the government.

*Id.* at 323. Without addressing the "glove substitution" issue, Transcendence instead offered "to expedite the delivery schedule" of the proposed Synguard PPE to

April 14-28, 2021, and include "12 additional pallets of the same gloves to you as a concession." ECF 43-2 at 10–11.[6]

### D. Contract Termination

Transcendence did not deliver any nitrile examination gloves to the VA by the contracted March 8, 2021 deadline. *See, e.g.*, ECF 37-1 at 326. On March 9, the Contracting Officer terminated the contract for cause, explaining

> The reason this purchase order is being terminated for cause is due to the fact that your company is unable to provide the required nitrile gloves by the established delivery date of 08 March 2021.
>
> In an effort to avoid this route, the Government was willing to provide a short extension in exchange for consideration as long as your company could guarantee the new date in writing from the manufacturer (Medivico). However, in your response, it was stated that your company could not provide this guarantee.

*Id.*

## III.   Servant: Pre-Award Events, Performance, and Termination

### A. Servant's Quote and Pre-Award Communications

In response to Solicitation No. 36C24921Q0115 dated February 9, 2021, Servant submitted a quote to supply 50 million SGH nitrile examination gloves for $7.495 million.[7] *Id.* at 408, 414, 471. According to Servant's quote, the proposed gloves were manufactured by Chinese OEM Dong Tai (same OEM referenced in Transcendence's quote), branded as "Sumner Group Health" or "SGH" nitrile examination gloves, distributed by SGH through Alliance HealthCare Partners,

---

[6] The record does not indicate whether the Contracting Officer responded to Transcendence's specific follow-up offer to supply substitute PPE, including bonus product, if granted a 5-to-7-week extension; instead, as detailed below, the Contracting Officer terminated Transcendence's contract for default the following day.

[7] Servant's original February 15, 2021 quote included a "grand total" price of $51.475 million; on March 3, 2021, Servant clarified the company's price quote of $7.495 million. *Compare id.* at 413 *with id.* at 540.

then resold by Servant.[8]  *Id.* at 471–72 (listing Dong Tai as the OEM); *id.* at 470 (Servant proposed logistics chain); *id.* at 479 (SGH letter noting relationship between entities).[9]  For the required product documentation, Servant submitted: a "SGH Nitrile Gloves Brochure" which included packaging designs for proposed SGH gloves; and company literature of "Huayuan Medical," which included product testing reports and certifications for Dong Tai products.[10]  *Id.* at 483–534.  In response to the PPE Source Questionnaire, Servant indicated that the proposed products were "already produced" and "located" in Thailand, and that it had 350 million gloves "on hand (in-stock and available for immediate delivery)."  *Id.* at 470.

On February 19, 2021, after a preliminary review of Servant's quote, the Contracting Officer requested that Servant clarify the inconsistent product labeling and various entities referenced in its quote as well as confirm "which glove is being offered and ensure all documentation represents such."  *Id.* at 535–37.  The Contracting Officer again reached out to Servant on March 2, 2021, to confirm the company "can deliver 50,000,000 nitrile gloves (Dong Tai City Huayi Gloves) within 45 calendar days from an award date for a total of $7,495,000.00."  *Id.* at 541.  Servant confirmed the next day and even offered to supply up to 200 million Dong Tai gloves within 45 days, stating:

> [We] hereby confirm that Servant Health can deliver 50,000,000 nitrile gloves of Dong Tai City Huayi Gloves (500,000 boxes of 100) within 45 days from the award date for a total of $7,495,000.00.
>
> Servant Health also guarantees they can deliver a total of 200,000,000 nitrile gloves of Dong Tai City Huayi gloves (2,000,000 boxes of 100) within 45 calendar days of the award date.

---

[8] In response to the VA's request for clarification, discussed *infra*, Servant represented that "[the OEM Dong Tai] 'white labels' these gloves. Thus, the product number is according to their customer's desires[] which is the reason it is labeled as Sumner Group Health gloves."  *Id.* at 536; *see also id.* at 535 ("Dong Tai manufactures this glove for other 'brands,' such as Sumner Group Health. Thus, the box will say Sumner Group [Health] (called white labeling), but the actual K number (specs and manufacturing process) is from Dong Tai.").

[9] Servant submitted a "Letter of Supply and Confirmation of Reseller" issued by SGH, wherein SGH represents: "As the OEM, we acknowledge Servant Health as an authorized reseller through our authorized distributor Alliance Healthcare Partners."  *Id.* at 479.  SGH's self-claimed "OEM" status is contradicted by Servant's representation in its quote and its communication with the VA, which claimed Dong Tai as the OEM.  *Compare id.* at 479 *with id.* at 471–72 (listing Dong Tai as the OEM) and *id.* at 536 (clarifying Dong Tai as the OEM).

[10] Servant's product documentation includes the same ISO 9001 certificate issued for Dong Tai included in Transcendence's quote with a different header and footer.  *Compare id.* at 496 *with id.* at 149.  The FDA 510(K) documents included in Servant's and Transcendence's quotes cite to the same Dong Tai product with the assigned 510(K) number of K131823.  *Compare id.* at 498 with *id.* at 141.

. . .

> Servant Health guarantees their ability to deliver 500,000,000 nitrile
> gloves of Dong Tai City Huayi gloves (5,000,000 boxes of 100) every
> 30 days for 36 months to the VA, if the need is required.

*Id.* at 540.  Later that day, after clarifying certain pricing errors listed in its quote,
Servant followed up "to convey our capability and guarantee our capabilities."  *Id.*
at 539.

    *B.  Servant's Contract Award*

    On March 11, 2021, the Contracting Officer notified Servant of the VA's
intention to issue an award to the company stressing, among other things, that the
award was for the SGH brand gloves Servant offered, no substitution was allowed,
and the 45-day deadline was firm and non-extendable:

> Prior to signing the [award] document, there are some items that need
> to be re-addressed and/or re-confirmed. Due to recent past experiences,
> I want to overcommunicate these points.
>
>   1. Attached are the boxes that were submitted with your quote.
>      Boxes received by the warehouse shall match.
>
>   2. The delivery date is set for 26 April 2021 for 100% qty of
>      gloves being awarded. No extensions will be granted. This
>      includes but is not limited to delays with the manufacturer,
>      the suppliers, shipping delays, customs, and the pandemic.
>
>   3. Price per glove is 14.99 cents. . . .
>
>   4. Glove substitutions are not allowed.
>
>   5. Ensure to communicate with both the contracting office and
>      the DLA warehouse personnel; including weekly updates to
>      the contracting office. Ensure communication with DLA is
>      done well ahead of time of each and every shipment/delivery.
>
>   6. Please confirm the required documentation has been
>      completed and submitted for [government accounting].

*Id.* at 542.  The VA finalized and issued the award on March 11, 2021, and Servant
immediately signed and returned the contract.  ECF 49-1 at 3.  Consistent with
Servant's quote and pre-award assurances, the VA issued Purchase Order

No. 36C24921P0321 to Servant for the supply of 50 million SGH brand nitrile gloves for a total of $7.495 million. *Id.* at 3, 9 (listing OEM name, MPN, and pricing included in Servant's quote). The delivery deadline, confirmed by Servant, was 45 days after award (i.e., April 26, 2021). *Id.* at 3, 8. In all other aspects, Servant's contract is substantively identical to Transcendence's contract. *Compare id.* at 3–26 (Servant contract) *with* ECF 37-1 at 265–88 (Transcendence contract).

### C. Servant's Performance

Despite the VA requiring "weekly updates to the contracting office" and coordination with the delivery warehouse in advance of any delivery, by April 14, 2021—34 days into the 45-day contract performance period—Servant had not provided the VA any updates. Consequently, the Contracting Officer reached out to Servant for an update and, after receiving no response, followed up two days later. ECF 37-1 at 579–80 (VA emails requesting updates and urging Servant to coordinate with the warehouse for delivery). Servant's April 16, 2021 response represented that "the boxes arrive on [April 20, 2021] and we are scheduling deliveries to the drop point on [April 21, 2021]." *Id.* at 579. Servant even inquired whether the VA would be interested in purchasing additional boxes of PPE shipped with the purchased supply. *Id.*

When asked about the sizes and prices for the additional boxes, Servant indicated that it could not confirm the exact over-delivery quantity until the company inspected their "pending air shipment." *Id.* at 576. In the same April 21, 2021 email—sent five days before the delivery deadline—Servant also provided an ambiguous delivery update:

> [W]e already have seven of 16 trucks scheduled with Chambersburg delivery point and will be scheduling additional trucks over the next two days to complete our deliveries of the 500,000 boxes throughout [the week of April 26-April 30, 2021].

*Id.* Left with little certainty as to the exact delivery date(s), whether Servant would meet the April 26, 2021 delivery deadline, or if there had been advanced coordination with the DLA warehouse, the Contracting Officer followed up for clarification:

> Can you provide me with whom (name) the delivery coordination was completed with at the DLA Warehouse?

> The seven scheduled deliveries are scheduled when? How many trucks per day and how many pallets?

> Quantity per box by size and case? 100/box? 10boxes [sic] per case?

14

> Thanks for your assistance as I want to make sure we are ready for
> delivery and you don't run into delays at our delivery location.

*Id.* at 575.  Receiving no response, and with the deadline approaching, the
Contracting Officer followed up again the next day.  *Id.* at 574.

The night of April 22, 2021, Servant responded with a forwarded email
from the company's Chief Operating Officer (COO) Ben Davis.[11]  ECF 37-1 at 581.
COO Davis did not directly answer the questions the Contracting Officer raised.
Instead, citing delays at certain unspecified "California ports" due to an unspecified
"Suez Canal issue," COO Davis indicated that partial delivery might arrive starting
April 23, 2021, and the remaining portion would not be delivered until early
May 2021:

> [W]e have nine (9) [bills of lading (BOLs)] attached showing successful
> shipments arriving at the delivery point in Chambersburg starting
> [April 23].
>
> . . .
>
> I have attached the nine BOLs booked so far that total the following
> quantities of OEM Dong Tai Nitrile Gloves:
>
> . . .
>
> Total gloves confirmed for delivery: 33,017,000 gloves[.]
>
> We are receiving our last lots of gloves from port today
> through [April 27, 2021,] and expect all product to ship out
> from [Los Angeles] no later than [April 30, 2021] (for deliveries
> no later than [the week of May 3–9, 2021,]) to complete our
> order of 50,000,000 gloves. . . .

*Id.* at 581–82.  The record includes only eight of the nine shipping documents
purportedly attached to Servant's email; seven documents bear no signature, and
none mention Servant or SGH.  *See id.* at 584–91.  The eight documents list freight
shipping from New Mexico, California, and Michigan—one of which indicating
arrival at the VA warehouse on April 26, 2021, five on April 27, 2021, and the
remaining two bearing no estimated delivery date.  *Id.*  Four of the shipping
documents list the "shipper" as "ICU Production, Inc." or "ICU Productions,"

---

[11] The record presented suggests Mr. Davis served as Servant's President during the time in issue.
*See*, *e.g.*, ECF 43-2 at 89.  However, the company's website currently lists Mr. Davis as Servant's
COO.  *See* https://servanthealth.com/our-team/ (last visited Aug. 4, 2022).

three list "Pixior," and one lists "Tac Possibilities." *Id.* None of these companies were disclosed in Servant's quote or otherwise mentioned by Servant pre-award.

The Contracting Officer followed up the next day, requesting that Servant "provide the number of gloves that will definitely be delivered by 26 April 2021 and the number that will not along with a guaranteed delivery date for the qty that will not meet the April 26th date." ECF 43-2 at 88–89. After reminding Servant that "failing to provide the contracted 50M nitril gloves by 26 April 2021 is a breach of [the] contract," the Contracting Officer nevertheless expressed willingness to "extend the delivery date for a portion of the gloves in exchange for a price reduction and/or additional nitrile gloves at no cost to the government." *Id.*

Despite the pointed follow-up, Servant's April 23, 2021 response did not include the requested delivery information. *See id.* at 87–88. Instead, Servant informed the VA that 33,017,000 gloves "will deliver no later than [April 30, 2021]." *Id.* at 88 (representing that the company switched to air shipping but could not "get all 50,000,000 gloves on planes," citing "extenuating circumstances in global logistics due to the pandemic"). For the remaining 17 million gloves, Servant referenced a schedule of weekly deliveries through the end of May 2021 and offered the VA a discount. *Id.* (Servant offered quantities over 33 million "at a reduced price of $.10/box of 100 gloves" (emphasis omitted)).[12]

Three days before the April 26, 2021 deadline, with no clear answer, the Contracting Officer contacted Servant again, requesting that the company specify: "How many gloves (including breakdown of size) have or will be delivered by COB April 26th. Have these deliveries been coordinated and confirmed with the warehouse personnel?" ECF 43-2 at 87. The Contracting Officer also asked about the exact amount of additional time Servant was requesting to complete delivery of the 50 million nitrile examination gloves and what consideration the company was offering in exchange. *Id.*

On April 25, 2021, Servant provided a schedule breakdown. *Id.* at 93. According to Servant, 19 million nitrile examination gloves were to be delivered by April 27, 2021—the day *after* the April 26, 2021 deadline—and another 19 million "will be delivered or in route" by April 30, 2021. *Id.* As for the remaining 12 million PPE, Servant put forth two proposals: (1) delivery by May 7, 2021, in exchange for an "$87,767.10 equitable judgment in favor of the VA"; or (2) delivery "no later than Friday, May 28, 2021," in exchange for a "$148,702.10 in equitable adjustment in

---

[12] The Contracting Office interpreted Servant's proposed discount to mean a reduction in price of $0.10 per box of gloves. *Id.* at 87 (understanding Servant's offer as "a 10[-]cent deduction [per box] on 170,000 boxes"). Servant later claimed it had "offered to sell excess gloves for a reduced price of $.10/*glove*," as opposed to "$.10/*box*." *Compare* ECF 43 at 16 (emphasis added) *with* ECF 43-2 at 88 (emphasis added).

favor of the VA." *Id.* at 93–94.  Acknowledging the delay in contract performance, Servant "highlight[ed] the major reason for what we consider an excusable delay." *Id.* at 92 (referencing "supply-chain crisis" reported in certain media articles and an excerpt on shipping delays from Shanghai – West Coast in February 2021 "before the Suez [C]anal and other related factors" due to the global pandemic).  Servant remained notably silent on the exact number of nitrile examination gloves it would timely deliver the following day (i.e., the April 26, 2021 delivery deadline).

> The Contracting Officer inquired again:
>
> Please provide the number of gloves including size that have or will be delivered by COB tomorrow, April 26. Also please provide this information on any deliveries that are currently scheduled past April 26th and please confirm that this information has been provided to the warehouse personnel.
>
> Overall, I'm looking for exact information on how many gloves have/will be received by COB on April 26th, how many gloves/deliveries already have been coordinated with the DLA warehouse to be delivered after April 26th, and how many gloves/deliveries have not been coordinated with the DLA warehouse.

*Id.* at 90–91 (reiterating contractual requirements for delivery by April 26, 2021, and advance coordination with the warehouse).  Addressing the "Supply Chain Crisis" cited in Servant's email, the Contracting Officer explained: "The pandemic and the strain on PPE supply chain has been going on for several months and well before the posting of the solicitation," reminding Servant that the solicitation and award explicitly "request for quantity on hand to be delivered within 45 calendar days."  *Id.*  The Contracting Officer further noted: "As previously stated, delays regarding (including but not limited to) shipping, customs, pandemic and supplier are not deemed excusable."  *Id.*  Later that evening, Servant responded that it "will send . . . exactly the answers you are looking for" regarding its delivery schedule.  *Id.* at 90.  Servant then added "while our OEMs had the quantities on hand, the known logistics and transportation delays were exacerbated by the post-award blockage of the Suez Canal on March 23rd and subsequent global domino effects." *Id.*

The next day—the April 26, 2021 contract deadline—the VA Contracting Office discovered Servant made an unannounced delivery to the DLA distribution warehouse on Friday, April 23, 2021, and that the delivery was far short of 50 million nitrile examination gloves and differed from the product Servant offered and contracted to supply.  *See id.* at 97–102 (photographs of Servant's April 23, 2021 delivery); ECF 37-1 at 594–97 (internal VA discussion documenting that the warehouse had not received any "delivery schedule," "advance shipping notice," or

"delivery information with number of pallets and number of trucks"); *id.* at 598 ("I am concerned because the picture of what [the warehouse] received . . . does not match what was included in the Technical Evaluation package. . . .   The vendor sent the SGH Nitrile Glove Certification and SGH Nitrile Brochure, and none of the documents match what we received.").  Given the discrepancies, a VA procurement official recommended the VA Contracting Office not certify Servant's invoice "until we know if this glove is indeed what was proposed."  *Id.*  Upon further review, the warehouse official expressed additional concerns about the lack of a product "stock number" on the packages received.  ECF 37-2 at 36.

The Contracting Officer immediately contacted Servant regarding the discrepancies and referenced his pre-award March 11, 2021 email wherein he stressed, among other things, that "[g]love substitutions are not allowed."  ECF 37-1 at 593; *see id.* at 542 (March 11, 2021 email).  COO Davis responded that he was not previously aware of the March 11, 2021 correspondence, and "thus was unaware of any such request."  *Id.* at 592.  Although COO Davis acknowledged that the PPE delivered were of a different brand and packaging from that included in Servant's quote, he claimed the nitrile examination gloves were manufactured by the same OEM (Dong Tai) and were of the same quality.  *Id.* at 592–93.

To verify Servant's representation that the April 23, 2021 (partial) delivery included "the same gloves that were submitted and approved," the Contracting Officer requested supporting documentation from both Servant and SGH.  *See* ECF 37-2 at 46.  Servant responded with the same product information submitted with the company's original quote save the SGH nitrile glove brochure and the "Authorized Distribution Letter."  *Compare id.* at 47–89 (product documentation included in Servant's April 27, 2021 response) *with* ECF 37-1 at 483–534 (product documentation included in Servant's February 15, 2021 quote).  The Contracting Officer again asked Servant for clarification on "how the documentation you sent (attached) confirms that the gloves at the warehouse are the same."  ECF 37-2 at 45.  In turn, SGH similarly represented to the VA Contracting Office that Servant's partial delivery were "[Dong Tai] gloves in [Dong Tai] branded boxes that meet the contract requirements."  *Id.* at 90–91; *see also* ECF 43-5 at 1–5 (VA communication with SGH).  Acknowledging that no SGS reports were provided for the PPE delivered, Servant encouraged the VA to "order an SGS on [the] gloves at the warehouse or send another third-party inspector/inspection" to ensure the gloves met the contract's specifications.[13]  ECF 37-2 at 92; *see also* ECF 43-5 at 1.  Despite additional back-and-forth with Servant, the VA's concerns remained unresolved.[14]

---

[13] SGS S.A. (f/k/a Société Générale de Surveillance) is a multinational corporation headquartered in Geneva, Switzerland, which provides independent testing, inspection, and certification services. *See* https://www.sgs.com/en (last visited July 25, 2022).

[14] *See, e.g.*, ECF 37-2 at 94 ("I have reached back out to SGH's CEO for additional documentation to show the link between Dong Tai and SGH along with other documentation regarding this order. We have a verified letter showing the relationship between SGH and Servant Health prior to award;

### D. Show Cause Notice and Contract Termination

The VA did not immediately terminate Servant's contract. Instead, on April 28, 2021—two days after the delivery deadline—the Contracting Officer issued the following Show Cause Notice:

> The contract called for 50M nitrile gloves to be delivered by 26 April 2021, and Servant Health only delivered 10.863M nitrile gloves. Additionally, Servant Health has failed to provide documentation to validate your company's claim that the delivered nitrile gloves are the same gloves evaluated and awarded. The Government is considering terminating the contract under the provisions for cause of this contract. . . .

*Id.* at 95–96. Servant responded on April 29 and May 3, 2021. *Id.* at 97, 99. The company's April 29, 2021 response made clear that Servant's partial delivery was not the SGH-sourced gloves it offered and, instead, sourced from some unspecified "alternate suppliers." *Id.* at 97.

Servant's May 3, 2021 follow-up response provided more details, including documentation regarding the alternate suppliers employed (i.e., ICU Production, Inc., Jay Imports). *Id.* at 99–223, ECF 37-3 at 1–9. Admitting the PPE supplied to date was in different packaging and sourced from entities not disclosed in the company's quote, Servant claimed it nonetheless complied with the contractual requirement that the gloves be manufactured by OEM Dong Tai. ECF 37-2 at 100. The documentation purported to "fully support the authenticity of the delivered gloves" (*id.*), but was not entirely consistent with Servant's representation. For example, Servant's May 3, 2021 email states "Shanghai Fortune International Co. Ltd. (Chinese legal name Suzhou Huazhiyuan International Trading Co. Ltd) is an owned manufacturer of Dong Tai City Huayi Gloves Co. Ltd." *Id.* at 100. The attached documentation reveals, however, that Suzhou Huazhiyuan is not the "Chinese legal name" of Shanghai Fortune, but rather claims to be "cooperating with" Shanghai Fortune; and rather than an "owned manufacturer" of Shanghai Fortune or Suzhou Huazhiyuan, Dong Tai is a subsidiary of Huayuan Medical. *Id.* at 103–04. Further, in two substantively identical letters (save the letterhead and signature), both Jay Imports and ICU Production claim to be an authorized distributor" of Dong Tai nitrile gloves and that Servant is their "authorized reseller." *Compare id.* at 105 *with id.* at 150. Servant's submission, however, does not include confirmation from Dong Tai of Jay Imports' claimed authorized

---

however, it really doesn't help much at this time since it has SGH info on it and the boxes don't."); *id.* at 93 ("Since all of the documentation that was provided and reviewed and approved by the Clinical [integrated product team (IPT)] was based on the Sumner Group box design and information, I do not think we can safely say it is ok to accept a different item.").

distributor status; in turn, the Dong Tai letter refers to ICU Production's authorized distributor status as to its "product Pure Nitrile Examination Gloves."[15]  *Id.* at 196. Servant's submission did not contain any information regarding either Pixior or Tac Possibilities.  *See* ECF 37-1 at 588–91.

Moreover, the product documentation Servant submitted for Jay Imports and ICU Production contain the same Huayuan Medical product literature Servant provided in its original quote, again *excluding* the SGH brochure.  *Compare id.* at 483–534 (production literature in Servant's February 15, 2021 quote) *with* ECF 37-2 at 105–48 (product documentation for Jay Imports included in Servant's May 3, 2021 response) *and* ECF 37-2 at 150–93 (product documentation for ICU Production included in Servant's May 3, 2021 response).  The information supplied for ICU Production also included an SGS Inspection Report and two pending SGS Inspection Requisition requests for certain Dong Tai nitrile examination gloves purchased by ICU Production.[16]  ECF 37-2 at 197–223; ECF 37-3 at 1, 4–9.  Product photographs included in the SGS documentation, however, do not match Servant's partial delivery to the DLA warehouse.  *Compare* ECF 37-2 at 205–06 (photographs included in Servant's May 3, 2021 submission) *with* ECF *id.* at 36–43 (photographs of Servant's partial delivery).

Servant's May 3, 2021 response also acknowledged (and self-excused) its delayed performance but did not specify a new delivery date(s).  With the delivery deadline passed—and having delivered 20% of the contracted amount with products not previously offered or accepted—Servant expressed willingness to discuss a new deadline.  *Id.* at 100–01.  In response, on May 5, 2021, the VA terminated Servant's contract for failure to perform "because Servant had not delivered the SGH gloves from its award and it acknowledged that it had obtained gloves from another source other than SGH."  ECF 37-4 at 53 (Worsham Decl. at ¶ 13).  The Termination Notice explains:

> The contract called for 50M nitrile gloves to be delivered by 26 April 2021 and Servant Health delivered less than 20M.
>
> Additionally, the award was based on documentation submitted by your company which included Sumner Group Health packaging and part numbers. In Servant Health's response to the Show Cause Notice, your company acknowledges the delivered gloves were obtained from another source other than Sumner Group Health and "that the packaging of the delivered boxes did not match the certification packet."

---

[15] It is unclear whether "Pure" refers to a certain product line or chemical purity.

[16] No separate SGS documentation was included for Jay Imports.

ECF 37-3 at 11; *see id.* at 12 ("Your company introduced additional companies who were not vetted during the evaluation process.").

## IV.   Noble: Pre-Award Events, Performance, and Termination

### A.  *Noble's Quote and Pre-Award Communications*

In response to Solicitation No. 36C24921Q0115 dated February 9, 2021, Noble submitted a quote to supply 50 million nitrile examination gloves from a number of "brand name[s]" (i.e., Cardinal, Skymed, Halyard, Medline, mCare) with various "OEM product number[s]" for $7.425 million. *Id.* at 16, 21–22, 29, 89. Accompanying its quote, Noble submitted company and product literature for itself and its suppliers as well as documentation for the proposed PPE. *Id.* at 23–28, 31–83. As for delivery, Noble stated it was "prepared to deliver the [g]loves within the 45-day allocated period or sooner." *Id.* at 29.

On February 26, 2021, after preliminary review of Noble's February 9, 2021 quote, the Contracting Officer notified Noble that "[t]he supporting documentation provided for Nitrile Gloves was lacking proof of minimum technical requirements (MTRs) as required by the Performance Work Statement in the RFQ." *Id.* at 134. Then, specifying the deficiencies, Contracting Specialist Scott Dickey invited Noble to supplement the information provided to date. *See id.* Following its review of the supplemental documentation supplied, the VA technical team determined that, among the products Noble offered, only the Mercator Medical mCare (Mercator mCare) nitrile examination gloves passed the technical evaluation. *Id.* at 132–33. Noble then confirmed that the company had 25 million Mercator mCare gloves available for delivery in varying sizes. *Id.* at 131–32.

As the VA continued to review Noble's quote through April 19, 2021, the Contracting Officer requested additional supplemental information, including: an authorized distributor letter for Mercator mCare products as well as the valid contact information of the letter's author; an OEM verification letter; "pictures of all six sides of the mCare glove box"; confirmation that the boxes "meet all FDA labelling guidelines"; and confirmation of the MPNs for each proposed glove size. *Id.* at 143–59, 160, 162. Responding to the VA's information request, Noble also offered several other available products, claiming that "[t]hese are top notch name brand nitrile gloves." *Id.* at 163–64 (Noble informing the VA that it "just received 35 million Cardinal and Medline gloves"). Declining Noble's offer for additional PPE, the VA explained: "Thanks, but we can only entertain what was originally offered and passed technical review. We are tracking mCare Glove only at this time." *Id.* at 162.

### B. *Noble's Contract Award*

On April 22, 2021, after the VA fully reviewed Noble's supplemental documentation, the Contracting Officer notified Noble that the VA intended to award the company a contract "for 25M Mercator Medical mCare nitrile gloves." *Id.* at 165. As with Servant, the Contracting Officer stressed, among other things, that no substitutions were allowed and that the 45-day delivery deadline was firm:

> Prior to signing the [award] document, there are some items that need to be re-addressed and/or re-confirmed. Due to recent past experiences, I want to overcommunicate these points.
>
> 1. Gloves boxes to be delivered shall match the ones submitted in your submission.
>
> 2. The delivery date is set for 10 June 2021 for 100% qty of gloves being awarded. No extensions will be granted. This includes but is not limited to delays with the manufacturer, the suppliers, shipping delays, customs, and the pandemic.
>
> 3. Price per glove is 15.85 cents. . . .
>
> 4. Glove substitutions are NOT allowed.
>
> 5. Ensure to communicate with both the contracting office and the DLA warehouse personnel; including weekly updates to the contracting office. Ensure communication with DLA is done well ahead of time of each and every shipment/delivery.
>
> 6. Please confirm the required documentation has been completed and submitted for [government accounting].

*Id.* at 165. The next day, in addition to certain payment processing requests, Noble requested "to extend the delivery date to June 23rd." *Id.* at 168.

Rejecting Noble's request to extend the contract performance period by nearly two weeks, the Contracting Officer explained "I cannot finalize the award since your company can no longer meet the 45 calendar day period of performance." *Id.* at 167–68. Noble immediately responded, assuring its ability to meet the 45-day delivery deadline, stating: "Please finalize the award, we will meet the 45 day delivery, I was just seeking an in case issue. But I confirm and attest that you will receive 25 million mCare gloves in that timeframe. We already scheduled pickups for Monday and will send you all the tracking." *Id.* at 167.

Out of an abundance of caution, the Contracting Officer reached out to Noble again, stressing the firm deadline and the risk of default termination if the company failed to adhere to all terms and conditions:

> As you know, the PPE world has experienced several ups and downs over the past year. Just on my solicitations/awards for nitrile gloves alone, they have been extremely challenging and that is why I continue to try to overcommunicate and re-emphasize several points before finalizing a contract. If I finalize the contract and if your company doesn't adhere to ALL of the terms and conditions then I will have to terminate the award for cause and input unsatisfactory ratings in both CPARS and FAPIIS system. It doesn't exclude a company from quoting on future opportunities but it could hinder potential future awards which is dependent on a CO's decision regarding a contractor's responsibility.
>
> With that said are you certain that you can deliver all 25M gloves by 10 June 2021? If not, is there a quantity of gloves that you can?

*Id.* at 166. Noble reassured the VA Contracting Office of the company's ability to perform and "adhere to all of [the VA's] conditions," noting that shipping would begin in days. *Id.*

Given Noble's assurances, on April 23, 2021, the VA issued Purchase Order No. 36C24921P0322 to Noble for 25 million Mercator mCare nitrile examination gloves for $3.962 million. *Id.* at 170–71, 177 (listing OEM and brand name, corresponding MPN, and pricing as proposed in Noble's quote). The delivery deadline, as Noble confirmed and assured, was 45 days after award (i.e., June 10, 2021). *Id.* at 171, 176. In forwarding the finalized award, the Contracting Officer again stressed: "As previously stated, the delivery date for all gloves is 10 June 2021; no exceptions. Please overcommunicate with updates to both [the] contracting [office] and the warehouse personnel." *Id.* at 170. Noble's contract is substantively identical to the awards to Transcendence and Servant, discussed *supra*. *Compare id.* at 171–94 (Noble Contract) *with* ECF 37-1 at 265-88 (Transcendence contract) *and* ECF 49-1 at 3–26 (Servant contract).

### C. Noble's Performance

Despite Noble's pre-award assurances, Noble did not provide regular delivery updates for the first three weeks of the 45-day performance period, either to the VA Contracting Office or the DLA distribution warehouse. *See, e.g.*, ECF 37-3 at 176 (contract providing "Appointments must be made ahead of delivery"); *id.* at 169 (pre-award communication requiring "weekly updates to the contracting office" and advance coordination with the designated DLA distribution warehouse before each

delivery); *id.* at 166 (Noble pre-award assurance that it will comply with all contract conditions); *id.* at 167 (Noble pre-award representation that the company "already scheduled pickups for [April 26, 2021] and will send [the VA] all the tracking.")

On May 17, 2021, without prior notice, the DLA warehouse received Noble's first (partial) delivery. *See id.* at 195. When notified of the delivery, the VA Contracting Office contacted Noble to confirm the shipment was from Noble, check on the status of the future deliveries, and remind Noble to provide the Contracting Office regular updates and coordinate with warehouse personnel in advance of deliveries. *Id.* Noble confirmed that the May 17, 2021 delivery was originally scheduled for May 12, 2021, a second delivery was expected in the next 24 hours, and that the company remained on track to meet the June 10, 2021 contract delivery date for the full PPE order. *Id.* Noble then reassured the VA Contracting Office that the company was "coordinating all shipments with the warehouse personnel." *Id.* The next day, the DLA distribution warehouse again received another shipment from Noble with no advance notice. *Id.* at 198. The Contracting Office reached out to Noble, reiterating the importance of advanced coordination. *Id.*

Upon inspection, the VA discovered that Noble's May 17-18, 2021 partial deliveries included nitrile examination gloves that were not disclosed in Noble's quote, let alone examined and accepted by the VA in awarding the supply contract. Specifically, the deliveries included "Unispace Health" branded gloves and gloves in boxes labeled "mCare" with different product numbers from those specified in the awarded contract. ECF 37-4 at 22–28. When asked, Noble acknowledged the discrepancies in packaging and product numbers, but claimed that the OEM (Mercator) "changed their packaging" and, at some point in time, "discontinued the mCare design." *Id.* at 40. Noble nevertheless represented that "Unispace and Nitrylex are mCare," and that "Mercator has recently began [sic] to replace the mCare line to Nitrylex and Unispace." *Id.* at 29–35, 36. In a follow-up email, Noble informed the Contracting Officer that future deliveries would include "a mixture of mCare boxes, Nitrylex boxes, and Unispace boxes." *Id.* at 36.

### D. Cure Notice and Contract Termination

On May 20, 2021—28 days into the 45-day contract performance period—the Contracting Officer issued the following Cure Notice, allowing Noble ten days to remedy its failure to deliver the PPE products originally offered to and accepted by the government:

> [T]he Government considers your inability to deliver the awarded nitrile gloves a condition that is endangering performance of the contract. Deliveries made to the Chambersburg warehouse contain product that does not match the packaging and manufactured [sic]

24

> part numbers (MPN[s]) [o]n which the award was based. The Noble
> Attorney proffered Mercator mCare gloves with MPN[s] 8859185-
> 200185/192/208/215 but instead shipped Unispace Health gloves with
> item number 01-1220-03-04 and mCare gloves with MPN[s] 1859185-
> 200175/182/199/205/212.  Additionally, as stated in your email dated
> 19 May 2021, your company plans on delivering Nitrylex gloves which
> also was not part of The Noble Attorney's quote submission.

*Id.* at 41–42.  Noble's May 20, 2021 response to the Cure Notice failed to provide
any assurance that Noble would deliver the promised Mercator mCare nitrile
examination gloves.  Instead, Noble restated its prior representation that "Unispace
and Nitrylex are manufactured by Mercator and they are the exact same specs as
mCare." *Id.* at 45.

On May 25, 2021, after additional back-and-forth between Noble and the
Contracting Officer (*see* ECF 37-4 at 43–44; ECF 43-2 at 162), the VA terminated
Noble's contract for cause due to its failure to deliver the contracted PPE.  ECF 37-4
at 47–49.  The Termination Notice explains:

> The contract called for 25M Mercator Medical mCare nitrile gloves
> with the manufacturer part numbers (MPNs) 8859185200185/192/
> 208/215. The Noble Attorney delivered Unispace Health with the
> MPN 01-1220-03-04 and mCare boxes with MPNs 1859185200182/
> 199/205/212.  On 19 May 2021, The Noble Attorney stated, "it is
> true that the packaging is different" and a third type of packaging
> (Nitrylex) would also be shipped.  Ultimately, none of the three match
> the packaging and the MPNs in which your company proffered.
>
> In response to the Cure Notice, The Noble Attorney mentioned
> Sante Group and stated this company was Mercator's North American
> distributor.  Sante Group was not mentioned in Noble Attorney's
> quote submission nor was documentation provided regarding this
> relationship prior to this award.

*Id.* at 49.

## V.    Plaintiffs' Challenges to Terminations for Default

Plaintiffs allege the Contracting Officer's decisions to terminate their
respective PPE supply contacts for default were improper, arbitrary and capricious,
and that the government breached its implied duty of good faith and fair dealing.
According to plaintiffs, the government should have accepted the substitute PPE
because they met the material contract terms, which plaintiffs contend are the
solicitations' technical requirements.  Transcendence also argues that its default

termination was invalid because the VA did not send a Cure Notice; relatedly, Noble argues the VA did not provide sufficient time to cure.  Plaintiffs further assert their delays were excusable and the government should have extended the delivery deadlines.  Plaintiffs contend the terminations for default were made in bad faith, without contract-related bases, and constituted abuses of the Contracting Officer's discretion.  Finally, plaintiffs maintain that the government breached its implied duty of good faith and fair dealing by imposing new contract requirements and not accommodating plaintiffs' substitution and excusable delays.

Defendant counters that the VA properly terminated the contracts for cause because each plaintiff failed to deliver the contracted PPE by the agreed upon firm deadlines.  The VA argues the terminations were further justified on anticipatory repudiation grounds, given Transcendence's advance notification that it would not deliver the contracted PPE and Servant's and Noble's similar statements after partially delivering non-conforming products.  Defendant argues plaintiffs' failures to perform were not excusable because they resulted from plaintiffs' choices to initially offer products without properly securing sufficient supply pre-award and then attempting to deliver substitute PPE without first notifying or seeking approval from the VA Contracting Office.  Defendant further maintains that the purported pandemic-related circumstances were known and foreseeable.  As for the Cure Notice challenges, defendant argues no Cure Notice was required for Transcendence and that additional time for Noble would have been futile given its claimed inability to deliver the promised PPE.  Defendant reiterates that the VA awards for PPE supply were based on plaintiffs' proposed products, as evaluated and approved pre-award, and that the firm 45-day delivery deadline (and the risk of default termination) were clear and accepted by each awardee.

## DISCUSSION

## I.   Legal Standards

### A.  *Cross-Motions for Summary Judgment*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a).  A "genuine dispute" exists where a reasonable factfinder "could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Material facts," in turn, are those "that might affect the outcome of the suit."  *Id.*  In deciding motions for summary judgment, particularly where, as here, the parties filed cross-motions for summary judgment, the Court must draw all inferences in the light most favorable to the nonmoving party, evaluating each motion on its own merits.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987).

The moving party bears the initial burden to demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). That burden can be met by showing "there is an absence of evidence to support the nonmoving party's case." *Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Celotex*, 477 U.S. at 325). "Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence." *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002) (citing *Anderson*, 477 U.S. at 248). Summary judgment is warranted when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587.

### B. Termination for Default

When a contractor challenges a termination for default, the government bears the initial burden to show the contractor was in default at the time of termination. *See Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 763–65 (Fed. Cir. 1987). For contracts concerning delivery of goods, "[a] contractor's failure to make timely delivery of agreed-upon goods establishes a prima facie [sic] case of default." *Gen. Injectables & Vaccines, Inc. v. Gates*, 519 F.3d 1360, 1363 (Fed. Cir.), *opinion supplemented on denial of reh'g,* 527 F.3d 1375 (Fed. Cir. 2008). Once default is established, "[t]he burden then shifts to the contractor to show that the failure to deliver the contract goods was excusable." *Id.* (citing *DCX, Inc. v. Perry*, 79 F.3d 132, 134 (Fed. Cir. 1996)). Under FAR 52.212-4(f), incorporated in the PPE supply contracts at issue, the contractor's failure to timely deliver is excusable if it "is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence." ECF 37-1 at 272 (Transcendence contract); ECF 49-1 at 10 (Servant Contract); ECF 37-3 at 178 (Noble contract); FAR 52.212-4(f).

The Court reviews an agency's termination for default *de novo*. 41 U.S.C. § 7104(b)(4); *see also McDonnell Douglas Corp. (McDonnell Douglas II) v. United States*, 323 F.3d 1006, 1018 n.3 (Fed. Cir. 2003). "In determining whether a default termination was justified, a court must review the evidence and circumstances surrounding the termination, and that assessment involves a consideration of factual and evidentiary issues." *McDonnell Douglas II*, 323 F.3d at 1014 (citing cases). As a general matter, government contracting officers have "broad discretion to determine whether to terminate a contract for default," and those decisions must be sustained unless they are "arbitrary, capricious, or an abuse of discretion." *Allen Eng'g Contractor Inc. v. United States*, 611 F. App'x 701, 705 (Fed. Cir. 2015) (quoting *Lanterman v. United States*, 75 Fed. Cl. 731, 733–34 (2007)). Nevertheless, in reaching a default termination, a contracting officer must "make sure that termination is in the best interests of the Government." *Nuclear Rsch. Corp. v. United States*, 814 F.2d 647, 649 (Fed. Cir. 1987); FAR § 12.403(b). Further, there must be a nexus between the default termination and the contractor's performance.

*See McDonnell Douglas Corp. (McDonnell Douglas I) v. United States*, 182 F.3d 1319, 1326 (Fed. Cir. 1999) ("[A] termination for default that is unrelated to contract performance is arbitrary and capricious, and thus an abuse of the contracting officer's discretion.") (citing *United States Fidelity & Guaranty Co. v. United States*, 676 F.2d 622, 630 (1982)).[17]

## II.    Contract Performance: Default and Repudiation

Plaintiffs each received a VA supply contract to deliver specific nitrile examination gloves to a designated DLA distribution warehouse within 45 days of contract award.  Transcendence did not deliver any gloves by the contract deadline and, instead, offered to supply substitute PPE in exchange for a contract extension. Servant made one delivery ahead of the contract deadline, but the nitrile examination gloves tendered were substitute products and a fraction of the quantity required; Servant then offered to supply additional substitute PPE in exchange for a contract extension.  Noble made two deliveries during the contract performance period and, like Servant, tendered only substitute PPE in quantities less than the contract required; in response to a Cure Notice, Noble offered more substitute products.  Accordingly, the Court finds that Transcendence and Servant failed to perform their respective contractual obligations and Noble repudiated its contractual obligations.

### A. *Failure to Perform: Transcendence and Servant*

Transcendence offered to supply 50 million Medivico nitrile examination gloves from Chinese OEM Dong Tai (MPNs HUNG100S/100M/100L/100XL) and deliver them to the designated distribution warehouse by March 8, 2021. *See* ECF 37-1 at 127–28 (Transcendence offer); *id.* at 271 (Transcendence contract "item information").  Pre-award, the Contracting Officer stressed the strict 45-day deadline and invited Transcendence to revise its quote if there was any change in the quantity the company could timely deliver.  *See id.* at 228–29.  Transcendence confirmed no changes were necessary and assured the VA of its ability to timely deliver the specified PPE.  *Id.* at 227–28.  As of the March 8, 2021 deadline, Transcendence made no deliveries.  *See id.* at 326.  Instead, on March 8, 2021,

---

[17] Citing *McDonnell Douglas I*, plaintiffs argue the terminations amounted to abuses of discretion because they were "unrelated to contract performance" and "pretextual."  ECF 43 at 39–40, 45, 52. Plaintiffs' reliance on this case is misplaced.  As discussed *infra*, contrary to plaintiffs' assertion, the Court finds that the Contracting Officer's decisions to terminate the contracts for cause were directly related to contract performance: plaintiffs' failures to timely deliver the contracted PPE they represented to have on hand pre-award and, instead, seeking to supply previously undisclosed (and unevaluated) substitute PPE sourced from previously undisclosed (and unvetted) alternate suppliers.

Transcendence offered to supply certain substitute products by April 28, 2021, seeking a 51-day extension of the 45-day contract.[18]   ECF 43-2 at 10–11.

Servant similarly offered to supply 50 million SGH nitrile examination gloves from Chinese OEM Dong Tai (MPNs SGHNEG-S/-M/-L/-XL) and deliver them to the designated distribution warehouse by April 26, 2021.  *See* ECF 37-1 at 471–73 (Servant offer); ECF 49-1 at 9 (Servant contract "item information").  Pre-award, the Contracting Officer stressed the strict 45-day deadline for 100% of the contracted quantity, and that "Glove substitutions are not allowed."  *See* ECF 37-1 at 542 (attaching product photographs Servant submitted and stressing delivery to the warehouse shall match).  Servant assured the VA of the company's ability to perform and timely deliver the specified PPE, even offering to increase the quantity four-fold within the same contract performance period.  *See id.* at 539–40 (guaranteeing ability to deliver 200 million SGH nitrile examination gloves within 45 days).  By the contract deadline of April 26, 2021, Servant delivered no contracted PPE; instead, Servant made one partial delivery of approximately 10 million substitute nitrile examination gloves (different brand and packaging) from undisclosed suppliers.  *See* ECF 37-2 at 97; ECF 37-3 at 11–12.  For the balance of the contracted quantity, and in response to the VA's Show Cause Notice, Servant proposed to deliver more substitute PPE by either May 7 or May 28, 2021, seeking a contract extension of 11 days or 32 days.  ECF 43-2 at 93–94.

Because Transcendence and Servant "fail[ed] to make timely delivery of agreed-upon goods," a *prima facie* case of default has been established with respect to each supply contractor.  *Gen. Injectables & Vaccines*, 519 F.3d at 1363; *accord Franconia Assocs. v. United States*, 536 U.S. 129, 143–44 (2002) ("Failure by the promisor to perform at the time indicated for performance in the contract establishes an immediate breach.").  Consistent with pre-award confirmation with each supplier, and as provided in the initial solicitations and restated in each contract award, "the contract[s] [were] terminated for cause" when plaintiffs failed to deliver the specified PPE by the agreed-upon deadline.  *See* ECF 37-1 at 268 (Transcendence); ECF 49-1 at 6 (Servant); *see, e.g., Fin. & Realty Servs., LLC v. United States*, 128 Fed. Cl. 770, 777 (2016) ("As a general rule, 'the government is

---

[18] In its complaint, Transcendence alleges that the Contracting Officer's failure to issue the company a Cure Notice renders its termination for cause invalid.  *See* Transcendence Compl. ¶¶ 20-24 (citing FAR 12.403).  Transcendence does not appear to raise this issue in its summary judgment motion.  Putting aside the issue of waiver, a cure notice is necessary "[i]f the contract is to be terminated for default before the delivery date" and "for a reason other than late delivery."  *See* FAR 12.403 (c)(1) ("The contracting officer shall send a cure notice prior to terminating a contract for a reason other than late delivery.").  Moreover, where, as here, the contractor notifies the government of their inability to deliver in the waning days and hours of the contract deadline, no Cure Notice is required.  FAR 49.607(a) ("If the time remaining in the contract delivery schedule is not sufficient to permit a realistic cure period of 10 days or more, the Cure Notice should not be issued.").

entitled to strict compliance with contract specifications.'") (quoting *TEG–Paradigm Env't, Inc. v. United States*, 465 F.3d 1329, 1342 (Fed. Cir. 2006)).

### B. Repudiation: Noble

Following the VA's evaluation of the various nitrile examination gloves Noble offered, the VA awarded Noble a contract to supply 25 million mCare nitrile examination gloves from Thai OEM Mercator (MPNs 8859185200185/192/208/215) and deliver them to the designated distribution warehouse by June 8, 2021. *See* ECF 37-3 at 150–62 (Noble providing photographs of Mercator mCare packaging and confirming MPNs); *id.* at 177 (Noble contract "item information"). Pre-award, the Contracting Officer similarly reiterated the firm 45-day delivery deadline for 100% of the contracted quantity, and that "Glove substitutions are NOT allowed." *Id.* at 165; *accord id.* ("Glove boxes to be delivered shall match the ones submitted in your submission."). Noble assured the Contracting Officer of the company's ability to perform and timely deliver the specified PPE. *Id.* at 167 ("I confirm and attest that you will receive 25 million mCare gloves in [the 45-day delivery] timeframe."). On May 17-18, 2021–three weeks ahead of the June 8, 2021 delivery deadline—Noble made two unannounced partial deliveries of substitute nitrile examination gloves, some were mCare brand but bore different MPNs and others were a different brand entirely and from a previously undisclosed supplier. In response to the VA's Cure Notice, Noble offered to continue providing substitute PPE. *See* ECF 37-4 at 42–46.

Noble's repudiation of the company's contractual requirements justified the default termination. *See, e.g.*, *Danzig v. AEC Corp.*, 224 F.3d 1333, 1337–40 (Fed. Cir. 2000) (default termination justified based on contractor's repudiation and failure to provide adequate assurances in response to Cure Notice). Once Noble communicated to the VA Contracting Office that the company would continue to supply only substitute PPE and, concomitantly, failed to provide adequate assurances of future performance in response to the Cure Notice, the government had the option of awaiting the delivery deadline to confirm Noble's failure to perform or treat Noble's renunciation as a breach. *See Franconia Assocs.*, 536 U.S. at 143 ("[T]he promisor's renunciation of a 'contractual duty before the time fixed in the contract for . . . performance' is a repudiation. Such a repudiation ripens into a breach prior to the time for performance only if the promisee "elects to treat it as such." (citations omitted)); Restatement (Second) of Contracts ("Restatement") § 250 (1981) ("[L]anguage that under a fair reading 'amounts to a statement of intention not to perform except on conditions which go beyond the contract' constitutes a repudiation."). Noble's repudiation, accompanied by non-performance ahead of the delivery deadline, "give[s] rise to a claim for total breach." Restatement § 243(b).

### C. Government's Best Interests

Plaintiffs question whether the Contracting Officer's decisions to terminate their respective PPE supply contracts were in the best interests of the government, arguing that re-procurement would take longer than awaiting plaintiffs' delayed deliveries and accepting substitute PPE. As an initial matter, in a related bid protest, the Government Accountability Office (GAO) rejected Noble's argument that the VA's award of other PPE supply contracts under the same solicitation were unlawful re-procurements, finding that they "were made under the existing solicitation and were not re-procurements." *The Noble Att'y, LLC; Am. Med. Equip., Inc.*, B-419884 et al., 2021 CPD ¶ 276, 2021 WL 3602132, at *4 (Comp. Gen. Aug. 2, 2021). Indeed, as detailed *supra*, rather than award one contract for the delivery of "hundreds of millions" of nitrile examination gloves, the VA purposely awarded a series of "smaller quantity" contracts under the same solicitations. *See* ECF 37-1 at 3–7 (Contracting Officer statement outlining contract awards); *id.* at 90 (January 6, 2021 solicitation) ("The Government intends to award one or more firm fixed price contracts resulting from this solicitation."); *id.* at 382 (February 9, 2021 solicitation) (same); *see also* ECF 43-3 (Dickey Dep. Tr.) at 22–23 (VA awarded total of fourteen contracts under the solicitations at issue); *id.* at 28 ("We were in a multiple award scenario situation. . . . [E]ach offer was put through the same system and it was independent of the other offers."). Such contracting effort increased the likelihood that any contractor's failure to perform would not impair the needs of VA medical staff. ECF 43-3 at 54 ("VA [personnel] do have the gloves to support what they need" at the time when plaintiffs' contracts were terminated).

Moreover, the VA's terminations for default were based on plaintiffs' failures and confirmed inabilities to deliver the specified PPE by the contract deadlines. Pre-award, Transcendence, Servant, and Noble each represented that they could supply 300 million, 350 million, and 25 million, respectively, of the nitrile examination gloves they proposed, and that the PPE was "already produced," "on-hand," "in stock," and "available for immediate delivery." *See* ECF 37-1 at 121 (Transcendence); *id.* at 470 (Servant); ECF 37-3 at 131–33 (Noble). Post-award, each contractor sought to deliver substitute products sourced through previously undisclosed suppliers and requested contract extensions. Transcendence did not reveal its plan until four days before the delivery deadline and sought a nearly two-month contract extension. ECF 37-1 at 318; ECF 43-2 at 10–11. In turn, despite the VA's pre-award communications stressing strict adherence to the delivery deadline and impermissibility of product substitutions, Servant and Noble made partial deliveries of substitute PPE from previously undisclosed suppliers— and only revealed their plans following the VA's inspections—and both sought extensions. *See, e.g.*, ECF 43-2 at 95, 97; ECF 37-4 at 40; ECF 43 at 44. These discoveries and untimely disclosures clearly undermined plaintiffs' representations regarding their ability to perform, even if granted the requested contract

extensions.[19]

"Well-established precedent holds that the government is entitled to strict compliance when it contracts for goods." *Hannon Elec. Co. v. United States*, 31 Fed. Cl. 135, 147 (1994), *aff'd*, 52 F.3d 343 (Fed. Cir. 1995). Based on plaintiffs' quotes, the VA contracted for the exact PPE plaintiffs proposed, represented to have on hand, and committed to timely deliver. After securing the purchase orders, plaintiffs sought to change the material terms of their respective contracts to allow them to supply substitute products sourced from undisclosed suppliers on extended timelines. Allowing a contractor to unilaterally modify material contract terms after-the-fact, however desirable to the contractor, does not the serve the best interests of the government.

Based on plaintiffs' pre-award commitments and post-award performance, the Contracting Officer consulted the procurement team, agency officials, and legal counsel and "determined that terminating [plaintiffs' contracts] for cause was in the best interest of the Government." ECF 37-4 at 55 (Worsham Decl. at ¶ 22) ("[E]ach contractor failed to adhere to the terms and conditions of the contract. The performance requirements were clearly expressed in the solicitation and awards, as were the consequences for failure to perform."); *see* ECF 43-4 (Worsham Dep. Tr.) at 40–41 (explaining considerations and process for termination); *accord* ECF 43-3 (Dickey Dep. Tr.) at 54 ("[I]t is in the government's interest, when there's an agreement made between a contractor and the government, that the government gets what is intended from the contract."). The circumstances surrounding each plaintiff's failure and confirmed inability to perform, discussed *supra*, fully support the Contracting Officer's determinations. *See Nuclear Rsch. Corp.*, 814 F.2d at 650–51 (finding default termination proper where factual circumstances support contracting officer's informed decision that termination would be in best interest of the government).

## III.   **Excusable Delay: Transcendence and Servant**

### A.   *"On Hand" PPE and 45-Day Delivery*

Against the backdrop of the rampant spread of COVID-19 and increasing PPE demand in VA healthcare facilities nationwide, the VA issued the solicitations at issue for "on-hand (or already in existence)" nitrile examination gloves available for delivery within 45 days. *See* ECF 37-1 at 3; ECF 43-3 (Dickey Dep. Tr.) at 34 ("we were very specific in [the] solicitation" that it was "a request for on-hand gloves, not manufactured gloves"); *Orsa Techs., LLC v. Dep't of Veterans Affs.*,

---

[19] Noble asserts it "would have been able to finish performance in full, with only a short extension." ECF 43 at 44; *see also* ECF 37-3 at 197 (shipping schedule Noble provided in May 2021 showing estimated delivery of the contracted quantity around June 10, 2021).

CBCA 7141, 22-1 BCA ¶ 38,025, 2022 WL 179215 (Jan. 18, 2022) ("The Government issued a solicitation designed to obtain that safety equipment as quickly as possible, attempting to guarantee fast delivery by limiting competition to contractors with those materials 'on hand' and 'in-stock,' with delivery of that 'on hand' safety equipment to be made within forty-five days after contract award.").  Emphasizing the importance of meeting the 45-day delivery deadline, the solicitations warned all potential awardees, including plaintiffs, that the deadline would serve as an eligibility requirement and that failure to meet the delivery deadline would result in termination for default.  ECF 37-1 at 90 ("Delivery Schedule: To be eligible for award, Offerors must be able to deliver within 45 calendar days from the award date."); *id.* at 383 (same); *id.* at 56 ("Contracts that are awarded based on submitted quotes will have 45 calendar days from receipt of order (award date) to deliver the awarded quantities, *or the contract will be terminated for cause . . . .*") (emphasis added); *id.* at 348 (same).

Reiterating the unequivocal contract terms, the Statement of Work included in each plaintiff's contract award states: "This is not a request for manufacturing but a request for quantity on hand to be delivered within 45 calendar days from order."  *See id.* at 56 (solicitation associated with Transcendence contract); *id.* at 348 (solicitation associated with Servant contract); *id.* at 268 (Transcendence contract); ECF 49-1 at 6 (Servant contract); ECF 43-3 (Dickey Dep. Tr.) at 62–63 ("[T]hat language was put into the solicitation and the contract . . . for the vendor's benefit to know the ramifications of not meeting the contract.").  Moreover, throughout the solicitation and contract award process, and then during the contract performance period, the VA reminded Transcendence and Servant of their delivery deadline.  *See, e.g.*, ECF 37-1 at 228 (VA pre-award communication to Transcendence stressing "I cannot express how important it is to verify you can delivery within **45 calendar days from Award**. If this is a factor then please revise the offer to indicate what can be received at shipping location below within 45 calendar days.") (emphasis in original); *id.* at 541 (VA pre-award communication to Servant requesting it confirm ability to deliver within 45 days); *id.* at 542 (VA pre-award communication to Servant stressing "The delivery date is set for 26 April 2021 for 100% qty of gloves being awarded. No extensions will be granted. This includes but is not limited to delays with the manufacturer, the suppliers, shipping delays, customs, and the pandemic."); *id.* at 574–75 (VA requests to Servant for delivery updates and reminders of the approaching delivery deadline); ECF 43-2 at 87 (same); *id.* at 90–91 (VA communication to Transcendence stressing the strict delivery deadline and that, as stated in "the solicitation and award, . . . it is not a request for manufacturing but a request for quantity on hand to be delivered within 45 calendar days," and that "the contract will be terminated for cause" if Transcendence fails to timely deliver).  Fully aware from the outset of the firm 45-day delivery deadline as well as the risk of default termination, Transcendence and Servant submitted their quotes and, thereafter, assured the VA Contracting Office

that the strict deadline would be met. *See, e.g.*, ECF 37-1 at 158, 172, 227–28, 290, 539–40.

At bottom, in awarding the PPE supply contracts, the VA made clear that the government was seeking delivery of the contracted PPE to its warehouses within 45 days of award. The government was not soliciting a manufacturing contract (or subcontract) or entertaining contractors unable to comply with the 45-day deadline or seeking an extension. Plaintiffs accepted the contract awards under these terms: deliver the contracted PPE within 45 days or face termination for default. That the contracts did not expressly prohibit plaintiffs from procuring the PPE from overseas and awaiting the award before securing the necessary supply of their quoted on-hand PPE does not excuse plaintiffs' failures to meet the 45-day delivery deadline or justify their demands for an extension. To find otherwise would empower plaintiffs to unilaterally modify a critical contract term after-the-fact despite the VA's unwavering position on the issue from the outset. It would also burden the government with the calculated risks plaintiffs took in not securing sufficient PPE pre-award or, at a minimum, more accurately tailoring their pre-award representations to the VA.

### B. Shipping Delays

Citing the "excusable delays" clause of their contracts, Transcendence and Servant assert that container shipping delays amid the global pandemic merited extensions of their delivery deadlines. To establish excusable delay, Transcendence and Servant must demonstrate that their untimely performance was attributable to unforeseeable causes beyond their control and without their fault or negligence. *See, e.g.*, *Gen. Injectables & Vaccines*, 519 F.3d at 1363. By its terms, FAR 52.212-4(f) is not triggered where the contractor or its subcontractor bears responsibility for the delay. *Gen. Injectables & Vaccines*, 519 F.3d at 1365.

As an initial matter, despite assertions of pandemic-related shipping delays, the record contains no shipping information (e.g., bills of lading, delivery schedule, estimated delivery dates) related to the contracted PPE that Transcendence never delivered. Transcendence informed the Contracting Officer that it could not timely deliver the contracted PPE four days before the delivery deadline, simply stating: "Medivico has informed us that they will not be able to deliver the required gloves on schedule due to unforeseen circumstances." ECF 37-1 at 293–94. The notice included no explanation of the cause(s) or extent of the delay. The next day, in seeking a 59-day contract extension, Transcendence added that Medivico was "unable to fulfill their obligation to [Transcendence] due to the current state of the PPE market." *Id.* at 318; *see also id.* at 320 (letter from Medivico stating "the PPE market has been plagued with unforeseen obstacles and unprecedented delays."). These generalized assertions do not support a finding of excusable delay.

34

Servant, in turn, blames the March 23-29, 2021 blockage of the Suez Canal. *See, e.g.*, ECF 43-2 at 90. In an April 22, 2021 email—sent a month after the accidental grounding of the Ever Given container ship and just four days before the delivery deadline—Servant's COO, citing two recent media reports, informed the Contracting Officer: "there have been many weeks delay at ports due to Suez Canal issue . . . and other extenuating global market conditions due to the pandemic that are directly affecting the California ports." ECF 37-1 at 581. Representing that PPE deliveries would begin on April 23, 2021, the bills of lading attached to COO Davis' April 22, 2021 email are devoid of any international transport schedule (by sea or by air); instead, they appear to be domestic drayage documentation suggesting that partial PPE deliveries were tentatively scheduled for April 26-27, 2021—on or one day after the contract deadline. *See id.* 584–91. Save COO Davis' continuing assertions, the record presented does not directly link the international transport of the specific PPE at issue to the cited Suez Canal incident. *See, e.g.,* ECF 43-2 at 88, 92.

Transcendence and Servant took on the calculated risks of procuring the contracted PPE from overseas manufacturers, awaiting their contract awards before seeking to secure the committed quantity, and selecting the mode of transpacific import and domestic drayage. Thus, they are responsible for any delays stemming from these choices. By the time the PPE supply contracts were awarded in early 2021—a year into the pandemic—Transcendence and Servant should have considered the possibility of COVID-19-related international shipping delays before committing to source the nitrile examination gloves abroad, transport them by cargo ship, get them through U.S. Customs, and then deliver the PPE to a designated warehouse in the United States within 45 days. *See Orsa Techs., LLC*, CBCA 7141, 2022 WL 179215 ("Because [the contractor] was well aware of the pandemic when it executed the contract at issue and was supposed to have had the gloves 'on hand' when it entered the contract, it cannot use the pandemic as a cause of excusable delay.").

Moreover, despite the contractual requirement for advance coordination with the designated DLA delivery warehouses—and, in Servant's case, the VA's explicit request for "weekly updates"—Transcendence and Servant only revealed their inability to make timely deliveries four days before their respective contract deadlines.[20] During the performance period, the Contracting Officer's repeated requests for updates went answered or were met with vague and unmaterialized representations. The supply contractors' failures to secure and share timely delivery updates during the period of contract performance does not support a finding that the belatedly reported delays were "without . . . fault or negligence." *Gen. Injectables & Vaccines*, 519 F.3d at 1363 (citing FAR 52.212-4(f)). A

---

[20] As noted *supra* Servant's partial delivery (of substitute PPE) ahead of the contract deadline was made with no prior notice or coordination.

contractor's mere reference to a listed event under FAR 52.212-4(f) (e.g., delays of common carriers, pandemic, quarantine restrictions) does not automatically excuse noncompliance particularly where, as here, the contractors accepted calculated risks of delayed delivery to increase their profits. *See United States v. Brooks-Callaway Co.*, 318 U.S. 120, 124 (1943) ("If fire is always an excuse, a contractor is free to use inflammable materials in a tinder-box factory and escape any damages for delay due to a resulting fire."). Based on the facts presented, excusing the untimely deliveries would "mak[e] the time fixed for completion practically meaningless and depriv[e] the Government of all recompense for the delay." *Id.* Transcendence and Servant have not met their burden of demonstrating that their failures to timely perform under their PPE supply contracts were excusable.

## IV.   Product Substitution

Plaintiffs assert that the VA improperly rejected the substitute PPE they partially delivered or offered, claiming that the contracts allow substitute products in different packaging from alternative suppliers. In support of their argument, plaintiffs maintain that the substitute PPE proposed post-award were functionally equivalent to the contracted PPE or were manufactured by the same OEM. Plaintiffs' interpretation of the contractual requirements finds no support in the contracts, the circumstances surrounding the contracting process, or the plaintiffs' communications and negotiations with the VA.

The purchase orders were awarded for specified PPE with unique MPNs, manufactured by specific OEMs, enclosed in identified branded packaging, sourced through vetted suppliers, and pre-cleared through the VA's technical evaluation. *See, e.g.*, ECF 37-1 at 271 (awarded PPE "item information" under Transcendence contract); ECF 49-1 at 9 (same for Servant contract); ECF 37-3 at 177 (same for Noble contract); ECF 37-4 at 54–55 (Worsham Decl. ¶ 21) ("The awards made were based on the contractor's quote which was for a particular brand of nitrile glove with specific characteristics, packaging, and item numbers, which had passed evaluation and were deemed technically acceptable for quality."); ECF 43-4 (Worsham Dep. Tr.) at 49 ("The purpose [for the VA solicitation was] to receive gloves that were based on the quotes submitted which includes packaging, technical information and so forth, so when those were evaluated and approved, those are the gloves we would receive."); *id.* at 55 (Ensuring the PPE received were from the proposed OEM is "not the only thing, no. That's part, but not the only thing. . . . [The gloves must] meet the specifications, but also what we review during the quote process because that was where the quotes were reviewed, deemed acceptable, and that's what we were expecting. So that's what we awarded on.")

As discussed *supra*, none of the plaintiffs delivered a single nitrile examination glove specified in their quotes and upon which the purchase orders were awarded. Instead, after declaring post-award that the proffered "on-hand"

PPE was not available, each plaintiff proposed substitutes product(s) sourced from previously undisclosed and unvetted sources. *See, e.g.*, ECF 37-1 at 293–94 (Transcendence substitutes); *id.* at 318 (Transcendence substitutes); ECF 37-2 at 100–01 (Servant substitutes); ECF 37-4 at 36–38 (Noble substitutes). The contracts, however, do not obligate the VA to accept plaintiffs' unilateral post-award substitutions or otherwise require the government to accommodate plaintiffs' failures to secure the necessary supply of their proposed PPE by, for example, vetting new suppliers, testing new products, or granting contract extensions.

"It is settled that the Government is entitled to obtain precisely what it contracts for as long as it does not mislead the contractor." *J.L. Malone & Assocs., Inc. v. United States*, 879 F.2d 841, 845 (Fed. Cir. 1989) (quoting *Am. Elec. Contracting Corp. v. United States*, 579 F.2d 602, 608 (Ct. Cl. 1978)). Nothing in the extensive record presented exhibits misleading conduct on the part of the VA Contracting Office. From the outset, the VA's expectations and communications were clear. The solicitations explicitly required bidders to submit documentation verifying the proposed PPE was supplied through authorized distribution channels and satisfied specified technical specifications. *See, e.g.*, ECF 37-1 at 56–57 (Statement of Work listing document submission requirements); *id.* at 348–49 (same); *id.* at 82–83 ("Instructions to offerors" reiterating document submission requirements); *id.* at 375–76 (same). The solicitations further required the submission of clear photographs of the proposed PPE packaging and the nitrile examination gloves. *See, e.g.*, *id.* at 109, 376. Incorporating the pertinent VAAR provisions, moreover, the solicitations prohibited gray market and counterfeit items and required supporting documentation from the OEM. *See, e.g.*, *id.* at 68, 116, 360; ECF 43-4 (Worsham Dep. Tr.) at 54 ("[I]f the quote submission is not from the OEM, then the person who is submitting quote needs to submit those letters [from the OEM] to show that they are authorized to basically sell those particular gloves from the OEM."); *see also Orsa Techs., LLC,* CBCA 7141, 2022 WL 179215 ("The solicitation also made clear that the VA had concerns about gray market products that might not provide the type of protections against COVID-19 and other diseases . . . and the VA was entitled to assurance that the products it was purchasing to protect against the spread of COVID-19 were of sufficient quality.") The solicitations forewarned offerors that failure to submit the required documentation would render their quote ineligible for award. *See, e.g.*, ECF 37-1 at 82–83, 109, 111–12, 331–32, 375–76.

Aware of these specific requirements, and touting significant supplies of nitrile examination gloves on-hand, Transcendence, Servant, and Noble submitted product documentation for their proposed PPE. *See* ECF 37-1 at 121 (Transcendence claiming 300 million proposed PPE on hand); *id.* at 470 (Servant claiming 350 million proposed PPE on hand); ECF 37-3 at 131–33 (Noble claiming 25 million proposed PPE on hand). The VA evaluated each quote based on the documentation submitted, conducting quality assurance technical reviews and

vetting distributors. *See, e.g.*, ECF 37-4 at 51–53 (Worsham Decl. ¶¶ 4–5, 9–10, 15–16) (discussing evaluation of plaintiffs' quotes); ECF 43-3 (Dicky Dep. Tr.) at 25–26 (explaining VA's evaluation process). Where, as with Noble, a contractor proposed multiple PPE of different brands and sources, the VA evaluated each brand and source and proceeded only with those that met the solicitation's technical requirements. *See, e.g.*, ECF 37-4 at 54 (Worsham Decl. at ¶ 20) ("Contractors *were* allowed to submit quotations for different gloves to be evaluated, and the Government would evaluate each glove offered.") (emphasis in original); ECF 37-3 at 132–33 (after requesting and reviewing additional product documentation, the VA notified Noble that only one proposed PPE passed the technical evaluation).

Throughout the solicitation and award phases, and during the contract performance period, the Contracting Officer stressed the no-substitution requirement. With Servant and Noble, the Contracting Officer "re-addressed," "re-confirmed," and "overcommunicat[ed]" that substitutions were disallowed immediately prior to the contractors' acceptance of the award. *See, e.g.*, ECF 37-1 at 317, 542; ECF 37-3 at 165. Prior to issuing Servant and Noble their purchase orders, the Contracting Officer also emphasized that the deliveries had to match the product photographs submitted in the supply contractors' quotes. *See, e.g.*, ECF 7-1 at 542 ("Attached are the boxes that were submitted with your quote. Boxes received by the warehouse shall match."); ECF 37-3 at 165 ("Gloves boxes to be delivered shall match the ones submitted in your submission."); ECF 43-4 (Worsham Dep. Tr.) at 59 ("[T]he specific purpose of the gloves arriving in a particular box . . . [is] [t]o make sure they match what was reviewed during the quote, make sure that the part numbers matched. To basically make sure what we get what we awarded for and reviewed.").

The purchase orders awarded to Transcendence, Servant, and Noble were based exclusively on the PPE proposed by each contractor in their respective quotes and approved by the VA Contracting Office; post-award substitutions were never contemplated or discussed, let alone approved by the government. *See, e.g.*, ECF 43-3 (Dicky Dep. Tr.) at 53 ("At no time during any of the [] solicitations for Nitrile gloves did [the VA] ever discuss amending the solicitation or the award to accept substitutions. That was one of the things that was forbidden."). The contracts do not grant or otherwise afford plaintiffs the right to insist that the VA accept purported equivalents or substitutes sourced post-award from undisclosed and unvetted suppliers, or "insist that the VA undertake additional post-award efforts to review additional products, potentially one after the other, for technical

acceptability."[21]  *Orsa Techs., LLC*, CBCA 7141, 2022 WL 179215 (citing *Am. Elec. Contracting Corp.*, 579 F.2d at 608).  The VA issued solicitations for PPE on hand, conducted evaluations and vetting pre-award, and conveyed the no-substitution policy to each plaintiff; therefore, the VA bore no obligation to expend the post-award effort to assist plaintiffs in finding acceptable substitutes.  *See* ECF 37-4 at 54–55 (Worsham Decl. ¶¶ 20–21) ("Allowing awarded contractors to change the terms of the contract and provide another glove after award would amount to unequal treatment with pre-award quoters and other potentially interested parties and would be unfair. In addition, it would likely expose the []VA to post-award bid protests.")

Additionally, plaintiffs' self-serving claims regarding the quality of substitute PPE lack clear evidentiary support as illustrated by certain deficiencies.  Despite the required OEM letter verifying authorized distribution channels, Transcendence provided no OEM documentation for either of its proposed post-award substitutes (i.e., Kimberly-Clark KC500 or Synguard).  *See* ECF 37-1 at 315 (ATX Capital Management, proposed supplier for Kimberly-Clark substitutes,[22] represented itself as "*either* the Manufacturer, Authorized Distributor, Authorized Sub Distributor or Title Holder" (emphasis added)); *id.* at 322 (undated letter from PharmacyGo, proposed supplier for Synguard substitutes, included no mention of the OEM).  Servant, in turn, provided no OEM confirmation of the authorized distributor status for one of the two claimed substitute suppliers, the product photographs included in the SGS documentation do not match Servant's partially delivered substitute PPE, and Servant failed to disclose any information about two of the suppliers involved in its partial delivery of substitute products.  In Noble's case, other than an assertion that the OEM changed packaging at some unspecified point in time, Noble supplied no product literature for the three substitutes it partially delivered.  The record is devoid of any information submitted by Noble regarding the specifications, MPNs, or technical capabilities for any of the three substitutes offered.  Plaintiffs' deficient

---

[21] In arguing the permissibility of substitution, plaintiffs rely on *Sherwin v. United States*, 436 F.2d 992, 1001 (Ct. Cl. 1971), and *Jack Stone Co. v. United States*, 344 F.2d 370, 376 (Ct. Cl. 1965).  The contracts and circumstances in those cases are readily distinguishable from those presented here.  Both *Sherwin* and *Jack Stone* involved the same standard-of-quality contract clause that explicitly allowed contractors to supply substitute products *if approved by the government.  See Sherwin*, 436 F.2d at 999–1001 (discussing application of the standard-of-quality clause at issue in *Sherwin* and in *Jack Stone*); *Jack Stone*, 344 F.2d at 375–76 (standard-of-quality clause allowed contractor to supply functionally equal substitutes "if the consent of the contracting officer was sought in advance").  The contracts awarded to Transcendence, Servant, and Noble do not contain a similar contract provision, nor is there anything in the record that indicates the VA approved or contemplated substitution; in fact, as detailed *supra*, the VA repeatedly stressed the opposite.

[22] The accompanying product literature in Servant's submission suggests the OEM was Kimberly Clark Corporation.  *See, e.g., id.* at 301, 308.  In addition, the submitted documentation contain information for products with at least two different FDA 510(K) numbers; the record was unclear which substitute Transcendence intended to offer.  *See, e.g., id.* at 310–14.

submissions likely would have been rejected during the VA's initial evaluation of quotes; accordingly, there is no reason to find that they should have been accepted by the VA post-award.

## V.     Implied Duty of Good Faith & Fair Dealing

Finally, plaintiffs argue that, in not extending the contract deadlines to allow their late deliveries of substitute PPE, the government violated its implied duty of good faith and fair dealing.  "The duty of good faith and fair dealing is inherent in every contract.  In essence, this duty requires a party to not interfere with another party's rights under the contract." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 828 (Fed. Cir. 2010) (citing Restatement § 205).  As explained by the Federal Circuit:

> Cases in which the government has been found to violate the implied duty of good faith and fair dealing typically involve some variation on the old bait-and-switch.  First, the government enters into a contract that awards a significant benefit in exchange for consideration.  Then, the government eliminates or rescinds that contractual provision or benefit through a subsequent action directed at the existing contract. The government may be liable for damages when the subsequent government action is specifically designed to reappropriate the benefits the other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract.

*Id.* at 829 (internal citations omitted).  What the precise duty of good faith and fair dealing entails in a particular case "depends in part on what that contract promises (or disclaims)."  *Id.* at 830.

In this case, as discussed *supra*, the express language of the contracts—fully supported by the parties' pre- and post-award communications—required delivery of the specific PPE plaintiffs proposed (which the VA vetted and approved) and required delivery within 45 days.  The contracts further noted that no extensions would be granted and that plaintiffs' failure to timely deliver would result in a termination for cause.  Accordingly, as in *Precision Pine & Timber, Inc.*, "[t]here are no . . . indicia of a governmental bait-and-switch or double crossing at work here." *Id.* at 829.  In terminating plaintiffs' contracts, the Contracting Officer did not "specifically target" plaintiffs, nor did it "reappropriate any 'benefit' guaranteed by the contracts."  *Id.*  The contracts did not provide that extensions of time would be granted or that post-award substitution of PPE sourced from undisclosed entities would be accepted; in fact, both were prohibited.

Put simply, the "implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties

inconsistent with the contract's provisions." *Metcalf Const. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014) (quoting *Precision Pine & Timber, Inc.*, 596 F.3d at 831). Plaintiffs accepted the unequivocal terms to deliver the specified PPE to the designated DLA warehouses within 45 days or risk default termination. The implied duty of good faith and fair dealing, "limited by the original bargain," does not justify modifying the terms as plaintiffs now wish, allowing plaintiffs to reap the benefit of the bargains while insulating them from the consequences of the calculated risks they undertook in contract performance. *Id.* (implied duty of good faith cannot "alter[] the contract's discernible allocation of risks and benefits" or "conflict[] with a contract provision.").[23] Accordingly, the Court finds that the government did not breach its implied duty of good faith and fair dealing.

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment (ECF 37) is **GRANTED** and plaintiffs' cross-motion for summary judgment (ECF 43) is **DENIED**. The Clerk is directed to **ENTER** judgment accordingly.

**IT IS SO ORDERED.**

Armando O. Bonilla
Judge

---

[23] In further support of this argument, plaintiffs reiterate their contention that the terminations were not in the best interest of the government. For the reasons stated *supra*, the Court finds this argument unpersuasive.